**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

HENRY BENITEZ,

                                        Plaintiff,

         - v -                                          Civ. No. 9:04-CV-423
                                                            (NAM/RFT)
J. LOCASTRO, *Lt.,et al.*,

                                        Defendants.

**APPEARANCES:**                        **OF COUNSEL:**

HENRY BENITEZ
Plaintiff, *Pro se*
97-A-2553
Upstate Correctional Facility
P.O. Box 2001
309 Bare Hill Road
Malone, N.Y. 12953

HON. ANDREW M. CUOMO                    TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, N.Y. 12207

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Henry Benitez filed this civil rights action, pursuant to 42 U.S.C. § 1983,

alleging that his constitutional rights were violated during several events that allegedly occurred at

Auburn Correctional Facility in 2001 and 2002.  Specifically, Plaintiff alleges violations of his

constitutional rights as guaranteed by the First Amendment (retaliation), Eighth Amendment

(excessive force and conditions of confinement), and Fourteenth Amendment (due process).  Dkt.

No. 5, Am. Compl.  Presently before the Court is Defendants' Motion for Summary Judgment, Dkt.

No. 118, which Plaintiff opposes, Dkt. Nos. 137-38.

Previously, this Court issued a Report-Recommendation and Order addressing Defendants' Motion for Judgment on the Pleadings, which was adopted in its entirety by the Honorable Norman A. Mordue, Chief United States District Judge for the Northern District of New York. Dkt. Nos. 106 & 108. Chief Judge Mordue's Order dismissed the following Defendants: Amberman, Christopher, Colon, Easterbrook, Kessel, Konecny, Lennox, Leonello, Loomis, Maccucci, McNamara, Melindez, Meyers, C.O. Miller, Murley, Parmiter, Porten, Quinn, Roux, Sgt. Smith, Wilkinson, and Yorkey. Dkt. No. 108, Order at p. 2.

Defendants' current Motion is brought on behalf of the remaining Defendants.[1]  For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED in part** and **DENIED in part**.[2]

## I. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "'pleadings, depositions, answers to interrogatories, and admissions on file, together with [] affidavits, if any,'" that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on

---

[1] The remaining Defendants are: Locastro, Lt. Miller, Selsky, Burns, Martens, Gummerson, Rourke, Bradt, Burge, Eagen, R. (C.O.) Smith, Baranska, (R.N.) Smith, Chilson, Kneeland, Clarke, Considine, Crozier, and Wolczyk. *See generally* Dkt.

[2] Because of the volume of claims and Defendants, the Court will recite the undisputed/disputed material facts as it addresses each claim.

the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is ]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs.,*

*Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

### B. Eighth Amendment Claims

#### 1. *Excessive Force and the Events of July 9, 2002*

Plaintiff asserts that "[o]n July 9, 2002, [he] threw a liquid substance through the narrow food port of his cell, striking [Defendants] Lennox and Martens." Dkt. No. 5, Am. Compl. at ¶ 26. Shortly thereafter

> Porten, McNamara, and various other guards approached Benitez's cell and ordered him to submit to mechanical restraints. Benitez then requested to be allowed to speak to a captain. Sergeant Vasile (not a defendant) refused, whereupon Benitez threw a liquid substance though the narrow food port on the gate of his cell.
>
> About 10 minutes after the incident described [] [above], [Defendant] Rourke walked past Benitez's cell and gave Benitez the finger. Shortly thereafter, Rourke and Defendants John Does Nos. 1-6 approached Benitez's cell. Rourke then asked Benitez whether or not he would come out of his cell. Benitez responded in the affirmative. With a callous and malicious intent to subject Benitez to gratuitous humiliation and punishment, Rourke ordered John Does Nos. 1-6 to forcibly remove Benitez from his cell.
>
> Acting on Rourke's order, John Does Nos. 1-4 rushed into Benitez's cell, whereupon John Doe No. 1 maliciously and sadistically struck Benitez on the top of his head with a large body shield [made of] plexiglas, knocking Benitez on his bed face down and breaking his eyeglasses. John Does Nos. 1-4 then maliciously and sadistically punched Benitez in his face, head, neck, back, rib cage and arms rapidly and repetitiously, and Benitez passed out.

\* \* \*

While punching Benitez about his body, John Does Nos. 1-4 maliciously and sadistically twisted Benitez's hands, fingers, and feet while simultaneously using enormous pressure to tighten too tightly handcuffs and leg irons that had been placed on Benitez.

John Does Nos. 1-6 forcibly removed Benitez from his cell and placed him in a strip cell. . . . There, John Does 1-6 cut Benitez's clothes off of his person. Benitez, who was then experiencing enormous pain about his entire body, was then "examined" by Defendant Nurse R. Smith. . . . Nurse Smith willfully and knowingly falsely wrote in Benitez's medical chart that he had minor injuries. Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain.

Thereafter, John Does Nos. 1-6 walked Benitez naked cuffed and shackled with a restraining strap from P3-cell into A1-cell. There, John Does 1-3 maliciously and violently slammed Benitez against a metal bed frame, causing Benitez to severely strike his face against the metal bed frame. While forcibly holding Benitez['s] face down on the metal frame, John Does Nos. 1-3 maliciously and sadistically punched Benitez on his face, head, back, rib cage, and arms, even though he did not struggle nor resist. John Does Nos. 1-3 then removed the handcuffs, shackles, and restraining strap from Benitez's person and rushed out of the cell.

*Id.* at ¶¶ 26-33.

Plaintiff alleges to have suffered several injuries as a consequence of the above incidents, including a "laceration in the front of his head," bruising all over his body, and "permanent nerve damage [to his] [] wrists, hands, fingers, and ankles." *Id.* at ¶¶ 34-35.

Defendants assert Plaintiff has failed to exhaust all of his claims arising out of the July 9, 2002 incident. The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004).

The New York State Department of Corrections has created a three-step grievance process known as the Inmate Grievance Program ("IGP").  *See Abney v. McGinnis*, 380 F.3d 663, 668 (2d Cir. 2004).  First, the inmate must file a grievance complaint with the Grievance Clerk within twenty-one (21) days of the incident.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) (2007).  The complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC) to review the grievance.  *Id.* at § 701.5(b).  Second, if the inmate disagrees with the IGRC decision, then the inmate may appeal to the Superintendent.  *See id.* at § 701.5(c).  Third, if the inmate disagrees with the Superintendent's determination, an appeal may be taken to the Central Office Review Committee (CORC) who renders a final administrative determination.  *Id.* at § 701.5(d).  Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983."  *Colon v. Harvey*, 344 F. Supp. 2d 896, 897 (W.D.N.Y. 2004) (citing *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001) & *Santos v. Hauck*, 242 F. Supp. 2d 257, 259 (W.D.N.Y. 2003)).

The Second Circuit has suggested a three-step inquiry when, as here, the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis*, 380 F.3d 663, 667-68 (2d Cir. 2004).  The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004).  If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord*, 380 F.3d 670, 676 (citing *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2003)[.]

*Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Braham v. Clancy*, 425 F.3d 177,

181-82 (2d Cir. 2005).

In response to Defendants' exhaustion argument, Plaintiff asserts that he was unable to exhaust these claims because (1) he was denied a pen and paper from July 9 through August 8, 2002; (2) from August 8-17, 2002, various Defendants refused to submit his outgoing mail and grievances; and (3) on September 4, 2002, he submitted a seven (7) page Grievance concerning the events of July 9th to Officer Hnatiw,[3] but Defendant Parmiter did not process that Grievance in order to obstruct his filing of a federal civil action. Dkt. No. 137, Pl.'s Mem. of Law at pp. 6-9 & Henry Benitez Decl., dated July 15, 2009, at ¶¶ 4-9; *see also* Am. Compl. at ¶¶ 51, 53, 55 & 86.

With respect to Plaintiff's first allegation, Defendants have submitted copies of Deprivation Orders indicating that Plaintiff was denied all in-cell property from, at the latest, July 14, 2002, through, at the earliest, July 25, 2002.[4] Dkt. No. 118-7, Mark L. Bradt Aff., dated Dec. 9, 2008, Ex. C, Deprivation Orders, dated July 9-25, 2002.

As per Plaintiff's second allegation, the record shows that he filed a Grievance, dated August 17, 2002, complaining that several Defendants refused to take his outgoing mail from August 8-17, 2002. Benitez Decl., Ex. B, Grievance, dated Aug. 17, 2002. The record also reflects that two of Plaintiff's Grievances, dated August 8, 2002, were not stamped received by the IGRC until August 21, 2002. Dkt. No. 118-5, Defs.' 7.1 Statement, Ex. P, Grievances, dated Aug. 8, 2002 (stamped received by the IGRC on Aug. 21, 2002). In one of those Grievances, Plaintiff asserted: "[o]n July

---

[3] Officer Hnatiw is not a Defendant in this action.

[4] The first Deprivation Order, dated July 9, 2002, indicates that Plaintiff was deprived only of cell water. Bradt Aff., Ex. C, Deprivation Order, dated July 9, 2002. On July 16, 2002, Bradt signed a Deprivation Order Renewal of the original July 9 Order, but also listed "cell property" as one of the deprivations. *Id.*, Deprivation Order, dated July 16, 2002. Thus, it is unclear if the "cell property" was omitted from the original July 9 Order, or if it was added as an additional deprivation upon renewal of that Order. Also, although Plaintiff alleges that these Deprivation Orders were continued through August 8, 2002, the copies of the Orders provided to the Court run only to July 25, 2002. Am. Compl. at ¶¶ 53 & 55; Brad Aff., Ex. C.

9, 2002, I was forcibly moved from SHU cell G-2 to SHU cell A-1 by an extraction team that, among other things, allegedly broke my glasses," and requested information about the status of the repairs to his broken glasses. *Id.*, Ex. P, Grievance, dated Aug. 8, 2002. That Grievance contains no other allegations concerning the events of July 9.

With respect to Plaintiff's claim that Parmiter refused to process a Grievance he filed on September 4, 2002, there is no evidence presented before us by either side to support or rebut that claim. However, such allegation was arguably raised, albeit with less specificity, in Plaintiff's Amended Complaint: "from August 8, 2002 to September 12, 2002, Parmiter willfully and knowingly wrongly refused to file numerous formal grievances submitted by Benitez." Am. Compl. at ¶ 86.[5]

Considering the above allegations about the obstruction of Plaintiff's grievances, and lack of evidence before us regarding those claims, we find that questions of fact exist with respect to whether the Defendants' own actions inhibited Plaintiff's ability to exhaust available administrative remedies, and therefore, whether they should be estopped from asserting the affirmative defense of failure to exhaust. The record shows that Plaintiff was deprived of all in-cell property for most of July 2002 and, as he points out, DOCS regulations require that grievances be submitted within twenty-one (21) days of the alleged occurrence. N.Y. CODES COMP. R. & REGS, tit. 7, § 705.1(a). Thus, it is possible that even if Plaintiff had filed a grievance after the Deprivation Orders were lifted it may have been denied as untimely. As such, there are also questions as to whether "special circumstances" exist that might justify Plaintiff's failure to exhaust. Therefore, we shall proceed

---

[5] In our previous Report-Recommendation, we dismissed any due process claim Plaintiff might have intended to assert concerning the failure to process grievances as an independent constitutional violation. Dkt. No. 106 at pp. 20-21.

to the merits of Plaintiff's claims surrounding the events of July 9, 2002.

Defendants assert that Plaintiff's excessive force claims against John Does Nos. 1-6 should be dismissed for failure to allege personal involvement on the part of any named Defendant. Defs.' Mem. of Law at p. 27.  In response, Plaintiff argues that the Defendants' failure to timely respond to his discovery requests delayed the revelation of the John Doe Defendants' identities. Pl.'s Mem. of Law at pp. 2-3.  We note that in an Order, dated August 29, 2006, this Court granted Plaintiff's Motions to Compel Defendants to respond to his outstanding discovery requests, some of which concerned the identities of the John Does.  Dkt. No. 88 at pp. 6-7.  Then, on June 12, 2007, this Court addressed Plaintiff's unopposed Motion for Sanctions against Defendants for their alleged failure to comply with our August 2006 Order; we denied Plaintiff's Motion for Sanctions, but ordered Defendants' compliance with our August 2006 Order.  Dkt. No. 91, Order at p. 3.

Plaintiff now asserts that the "Defendants recently complied with the Court's June 12, 2007 Order by disclosing to Benitez the identities of the Defendants at issue." Dkt. No. 137, Pl.'s Mem. of Law at p. 3.[6]  Moreover, Plaintiff asserts his intention to seek leave to file a motion to amend his Amended Complaint to assert claims against these would-be Defendants.  *Id.*  Given the mixed and prolonged history of discovery in this case, we believe it is appropriate to allow Plaintiff to submit a motion to amend his Amended Complaint in order to identify John Does Nos. 1-6.[7]  Therefore,

---

[6] In that respect, the Court notes that documents submitted in support of the Defendants' current Motion clearly indicate the names of the correctional officers involved in the July 9, 2002 cell extraction.  *See* Defs.' 7.1 Statement, Ex. C.

[7] The Court is aware that any such motion to amend will face serious and possibly fatal hurdles. The Second Circuit's interpretation of the "relation back" doctrine imbedded in Federal Rule of Civil Procedure 15 may leave Plaintiff no recourse as his failure to identify the John Doe Defendants was arguably not do to a mistake, but rather, to his own lack of knowledge.  *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.").  However, several courts in this Circuit, including this

(continued...)

Defendants' Motion is **denied** as to Plaintiff's excessive force claims against John Does Nos. 1-6. Should this Report-Recommendation and Order be adopted by the District Court, we shall afford Plaintiff **thirty (30) days** from the date of such adoption to file a motion to amend his Amended Complaint to include the names of John Does Nos. 1-6.

 Plaintiff's claim against Defendant Rourke should also survive the Defendants' Motion. Although Plaintiff does not allege that Rourke physically participated in the alleged use of excessive force, he claims that Rourke maliciously ordered John Does 1-6 to forcibly remove him from his cell despite his willingness to leave, and then shouted "stop resisting" in order to "encourage John Does Nos. 1-4 to continue to inflict gratuitous humiliation and extreme physical pain on Benitez, even though he knew that Benitez was not resisting John Does Nos. 1-4." Am. Compl. at ¶¶ 29-30. Liberally interpreted, Plaintiff has asserted a claim that Rourke failed to protect him once the alleged beating commenced, and then encouraged the John Does to continue in that conduct. Although the documents Defendants have attached as Exhibit C to their 7.1 Statement support their contention that Rourke had Plaintiff extracted from his cell in order to place him in a different cell with a more

---

[7](...continued)

one, have held that the aforementioned rule may not be applicable in all circumstances, particularly when a defendant has prevented the plaintiff from discovering the identity of the John Doe defendants and the plaintiff has taken reasonable affirmative steps to discover their identities. *See Jennings v. Dep't of Justice Serv.*, 2008 WL 2967533, at *5 (N.D.N.Y. Mar. 26, 2008) (Report-Recommendation and Order) *adopted in part and rejected in part on other grounds sub nom. by Jennings v. Ciciarelli*, 2008 WL 2967530 (N.D.N.Y. July 30, 2008); *see also, e.g., Byrd v. Abate*, 964 F. Supp. 140, 146 ( S.D.N.Y. 1997) (stating that "[t]o hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery requests until the statute of limitations has ended"); *Maccharulo v. Gould*, 2009 WL 2495780, at *6 (S.D.N.Y. Aug. 14, 2009) ("Where a plaintiff tries diligently during the limitations period to ascertain the identities of the intended defendants, failure to ascertain the correct names within the period, combined with some 'John Doe' or other generic identification in the pleading, may suffice to establish a factual 'mistake' supporting relation back."). Therefore, it would be rash at this juncture for the Court to rule out the possibility that Plaintiff's forthcoming second amended complaint will not relate back to his original Complaint under Rule 15.

secure food hatch so as to prevent his continued throwing of feces on prison staff,[8] nothing in the record answers Plaintiff's allegations that Rourke allowed and encouraged the use of excessive force against him <u>during</u> that extraction.  Therefore, it is recommended that the Motion be **denied** as to Plaintiff's claims against Rourke.

However, Plaintiff's claims against Defendant Nurse R. Smith should be **dismissed**. Plaintiff's Eighth Amendment claim against Defendant Nurse Smith is that after he was allegedly beaten by John Does Nos. 1-6 during the cell extraction, "Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain." Am. Compl. at ¶ 32.  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks and citations omitted) (alteration in original).  This standard contains both objective and subjective elements. *Id.*  "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."  *Id.* at 183-84 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) & *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

Defendants argue that Plaintiff has failed to allege that he suffered from a serious medical injury. Defs.' Mem. of Law at pp. 28-29.  Plaintiff alleges that at the time he was presented before Nurse Smith, he was suffering from "extreme pain," but he does not allege the nature of that pain,

---

[8] For example, in a copy of a memorandum from Rourke to Deputy Superintendent of Security Bradt dated July 9, 2002, Rourke states that he "went to SHU to help facilitate the move of [Benitez] to A-1 cell which has a more secure cell hatch.  On 7/9/02 this inmate had already thrown on (4) staff members in SHU." Defs.' 7.1 Statement, Ex. C-9, Mem. dated July 9, 2002.

its location, nor whether he communicated to Nurse Smith the nature or location of any injury he might have suffered or his need for pain medication.  Plaintiff does allege that as a result of the excessive force used against him, he suffered a "laceration to the front of his head, and abrasions and multiple areas of bright red bruising on his nose, back, chest, stomach, arms, hands, legs and feet," as well as "permanent nerve damage [to his] [] wrists, hands, fingers, and ankles."  Am. Compl. at ¶¶ 34-35.  However, Plaintiff does not allege that Nurse Smith was made aware of any of those aforementioned injuries, nor does he provide any factual basis for his conclusion that he suffered nerve damage.  With respect to his claims of bruises and a laceration (the size and depth of which he does not allege), those generally pleaded injuries do not constitute serious medical conditions under the Eighth Amendment.  *See, e.g., Dawes v. Coughlin*, 159 F.3d 1346 (2d Cir. 1998) (holding that a small laceration on an inmate's elbow was not a serious injury under the Eighth Amendment); *see also Dallio v. Hebert*, 2009 WL 2258964, at *16 (N.D.N.Y. July 28, 2009) (holding that black eyes, bruising, red spots, kick marks, and lacerations did not constitute a serious medical need).  Therefore, we agree with Defendants that Plaintiff's claim that he suffered from a serious medical injury is conclusory and for that reason his claim against Nurse Smith should be **dismissed**.[9]

### 2. *Deprivation Orders*

Plaintiff alleges that in November 2001 and July 2002, various Defendants issued Deprivation Orders against him in violation of the Eighth Amendment.[10]  Plaintiff's allegations

---

[9] Plaintiff does not allege that Nurse Smith participated in or was witness to any of the alleged acts of excessive force taken against him.

[10] Plaintiff also asserts these Deprivation Orders were motivated by retaliatory animus.  We address his retaliation claims below in Part I.D.

regarding November 2001 are as follows:

> Upon Benitez's arrival at Auburn prisoner's SHU on November 14, 2001, Defendant
> J. Burns [] wantonly filed a Deprivation Order . . . against Benitez in retaliation for
> his having sued Burns and various other Auburn prison employees in 1989.  As a
> result, Benitez was denied the following items and services from November 14 to
> November 26, 2001: all allowable in-cell property; sink and toilet water; showers;
> one-hour outdoor exercise period; and, among other things, law library services.

Am. Compl. at ¶ 8.

As for the July 2002 allegations, we summarized those claims in our previous Report-Recommendation addressing Defendants' Motion for Judgment on the Pleadings as follows:

> Plaintiff claims that Defendants Bradt and Chilson either approved or issued
> unspecified deprivation orders causing Plaintiff to be without the following items and
> services from July 9 through July 14, 2002: all in-cell property, pen, bed sheets,
> mattress, toilet tissue, running water, showers, exercise periods, and law library
> services.  Am. Compl. at ¶ 51.  Plaintiff also claims that from July 14 through July
> 25, 2002, and from July 25 through August 8, 2002, Defendants Bradt, Chilson, and
> Martens approved or issued more unspecified orders depriving him of the same items
> and services listed above.[11]  *Id.* at ¶¶ 53 & 55.

Dkt. No. 106 at pp. 12-13.

Plaintiff also claims in his Amended Complaint that the above-mentioned July 2002 Deprivation Orders were approved of by Defendants Burge, Kneeland, Rourke, Gummerson, and Wolczyk.  Am. Compl. at ¶¶ 52, 54, & 56.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996)).  With respect to deprivation orders, the Second Circuit has held that it is appropriate to consider whether the order in question "was reasonably

---

[11] In addition to the items listed, Plaintiff asserts he was denied "a water bucket" from July 25 though August 8, 2002.  Am. Compl. at ¶ 55.

calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff's] health and safety." *Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003).

Defendants assert that the Deprivation Orders enforced against Plaintiff were issued for valid penological reasons. Mark L. Bradt was a Deputy Superintendent of Security ("DSS") at Auburn from January 7, 2002 through April 30, 2004. Bradt Aff. at ¶ 1. Bradt avers that "in order to make determinations regarding appropriate levels of security and restraint for the inmates in the prison, [he] frequently consulted the disciplinary histories of the inmates at the prison." *Id.* at ¶ 5. Prior to his arrival at Auburn, Plaintiff had a lengthy disciplinary history, which included the following violations of DOCS rules:

> 1. creating a disturbance (5 times); 2. assault on staff (4 times); 3. lewd conduct (8 times); 4. threats (6 times); 5. unhygienic act (11 times); 6. arson (2 times); 7. flooding (2 times); 8. loss or damage to property (3 times); and 9. violent conduct (2 times).

*Id.* & Ex. A, Pl.'s Disciplinary History.

Bradt states that upon Benitez's arrival at Auburn on November 14, 2001, he was issued an order that deprived him of water, all cell property, bucket, and personal property from November 14-25,[12] 2001, because of his history of disruption and throwing things. Bradt Aff. at ¶ 7 & Ex. C, Deprivation Order, dated Nov. 22, 2001. That Deprivation Order was issued by then-DSS John Burns, who rescinded the order on November 26, 2001. *Id.*

On July 9, 2002, Bradt issued Plaintiff an order depriving him of cell water because Plaintiff had thrown "liquid substances on two (2) occasions from his cell onto Auburn C.F. staff members," and had flooded his and other cells in his section. Bradt Aff. at ¶¶ 8-9 & Ex. C, Deprivation Order,

---

[12] The original Deprivation Order was to last from November 14-22, but was renewed on November 23, 24, and 25, 2002. Bradt Aff., Ex. C, Deprivation Order.

dated July 9, 2002.  In his Amended Complaint, Plaintiff confirms that he engaged in such conduct.

Am. Compl. at ¶¶ 26 ("Benitez threw a liquid substance through the narrow food port of his cell,

striking Lennox and Martens.") & 28 ("Benitez [again] threw a liquid substance through the narrow

food port on the gate of his cell.").  Based on his judgment that Plaintiff continued to pose a security

threat, Bradt continued the Deprivation Order until July 14th.  Bradt Aff. at ¶ 9.  On July 14th,

Defendant Sgt. Martens recommended that the July 9th Deprivation Order be renewed because "on

7-9-02 [Benitez] threw feces on staff/nurse" and on "7-10-02 spit on staff while being served

misbehavior reports."  *Id.* at ¶ 10 & Ex. C, Deprivation Order.  On July 16th, Bradt authorized the

renewal of the July 9th Deprivation Order, which was apparently expanded[13] to include showers, cell

property, sheets and mattress, and renewed it again on July 20, 22, 23, and 24, 2002, "because

plaintiff posed a continued threat to the safety and security of staff, inmates, or State property."

Bradt Aff. at ¶¶ 10-11 & Ex. C, Deprivation Order, dated July 20, 2002.

For his part, Plaintiff alleges that these deprivation orders were retaliatory in nature.  He

points to a July 24, 2002 letter Bradt sent to Kate Rainbolt, a Staff Attorney for Prisoner's Legal

Services of New York, in which he stated:

> In response to your concerns be advised that inmate Benitez . . . is house[d] in "A"
> tank in the Special Housing Unit at Auburn.  He was involved in an Unusual Incident
> on 7/9/02 involving aggravated harassment.  The throwing of ones own human waste
> on another person isn't normal.  He was placed in A-1 cell as it has a more secure
> feed up hatch.  A Mental Health referral was submitted and OMH advised that
> *because of his agitated state that he be deprived of any item that he could use to*
> *harm himself.*  He has been given all of his entitled property.  Inmate Benitez was
> placed on a restricted diet in accordance with procedures established in Deputy
> Commissioner LeClaire's memo dated 4/24/00.

Benitez Decl., Ex. D, Lt., dated July 24, 2002 (emphasis added).

---

[13] *See supra* footnote 4.

Plaintiff argues that the italicized portion of the above letter undermines Bradt's statement that the Deprivation Orders were implemented due to his behavior. Pl.'s Mem. of Law at p. 11. That argument is without merit. The above letter provides additional confirmation of Benitez's gross acts, which Bradt asserts were the basis for the Deprivation Orders. Although Bradt mentions that certain objects were removed due to concerns over Plaintiff's mental health, that does not contradict his averment that the water, sheets, and other items were removed due to Plaintiff's behavior.

It is clear from the record that the above Deprivation Orders were issued in response to Plaintiff's own actions and history of misbehavior. *See Hudson v. McMillan*, 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)). Plaintiff has offered no evidence beyond his own accusations to suggest otherwise. Because there is no evidence of any deliberate indifference on Defendants' part, it is recommended that these Eighth Amendment claims be **dismissed**.

### 3. *Cell Ventilation*

Plaintiff alleges he filed a Grievance on January 26, 2002, complaining about lack of ventilation in his cell that was causing him "bronchospasm and great difficulty breathing." Am. Compl. at ¶ 15. Plaintiff asserts that Defendants J. Burge and T. Eagen reviewed his Grievance and failed to remedy the situation, which caused Plaintiff to suffer, on July 1, 2002, "great difficulty breathing and lost consciousness," and a severely injured head. *Id.* at ¶¶ 16-17 & 24.

The record reflects that Plaintiff filed a Grievance, dated January 26, 2002, in which he complained that the plexiglass shield used to cover the opening in his cell did not provide adequate

ventilation.  Defs.' 7.1 Statement, Ex. K, Grievance, dated Jan. 26, 2002.  In a Memorandum, dated

April 13, 2002, Sgt. Martens noted that "[t]here are numerous holes drilled in [the] cell shield for

adequate ventilation," and that he noticed upon inspection that Benitez "had piled in front of his cell

shield four (4) bags of legal work – blocking his ventilation holes."  *Id.*, Mem., dated Apr. 13, 2002.

Plaintiff appealed the January 26th Grievance to Superintendent Burge, who denied his appeal on

April 15, 2002, stating that "[a] private contractor completed a scientific survey of the air quality

of all cells in SHU," and that "[a]ll cells meet or exceed air quality standards."  *Id.*, Sup't Decision,

dated Apr. 15, 2002.  CORC also denied Plaintiff's Grievance on appeal.  *Id.*, CORC Decision, dated

May 15, 2002.

In another Grievance, dated July 1, 2002, Plaintiff complained that

[o]n July 1, 2002, at about 7 [] p.m., I began to sweat profusely and to experience
great difficulty breathing normally (I suffer from asthma).  Thereafter, I "blacked
out" (lost consciousness) and fell from my bed onto the floor, causing injury to my
head.  I have been experiencing difficulty in breathing normally and have been
drifting in and out of [consciousness] for the past 6 months due to inadequate
ventilation on the plexiglass which covers the entire front of my assigned cell.
Defs.' 7.1 Statement, Ex. N, Grievance, dated July 1, 2002.

That Grievance was denied after Nurse Administrator A. Driscoll reported that her examination of

Plaintiff on July 3, 2002, had revealed no abnormality in Plaintiff's lungs, nor did he exhibit any

difficulty breathing.  *Id.*, Investigative Rep., dated July 10, 2002.

As Defendants point out, Plaintiff does not allege the nature of his alleged head injury, nor

any other ventilation-related incident that occurred during the six-month period from January

through July 2002 during which Plaintiff alleges to have been deprived of adequate ventilation.  In

addition, Plaintiff offers no evidence to substantiate his claims that he was denied adequate

ventilation.  The evidence available indicates that the protective plexiglass shield, which was

*-17-*

imposed due to Plaintiff's affinity for throwing liquid substances from his cell, had holes in it, and

that Plaintiff never presented to medical staff with breathing problems.

Given the evidence before us, we find that no questions of material fact exist with respect

to these ventilation claims.  Therefore, these claims should be **dismissed**.

### 4.  *Denial of Meals*

In our previous Report-Recommendation addressing Defendants' Motion for Judgment on

the Pleadings, we recommended dismissal of the majority of Plaintiff's claims regarding his alleged

denial of meals.  Dkt. No. 106 at pp. 11-12.  However, we recommended against dismissal of

Plaintiff's allegation that he was wantonly deprived breakfast and lunch on January 28, 2002, by

Defendants Smith and Baranska, respectively.  *Id.* at p. 12; Am. Compl. at ¶¶ 22-23.

Defendants have now submitted a Grievance, dated January 28, 2002, in which Plaintiff

asserts that

> [o]n 1/28/02, Sgt. Murler informed me that he had been advised that Sgt. Cooper or
> Lt. Easterbrook had placed me on a so-called pre-hearing restricted diet.  I informed
> Sgt. Murler that any such pre-hearing diet would violate Directive 4933, §
> 304.2(b)(1)-(4) because that section does not authorize[d] imposition of a pre-
> hearing diet, and because I have not engage[d] in any misconduct that would warrant
> imposition of a restricted or pre-hearing restricted diet.  Nevertheless, *I was offered*
> *a restricted diet for breakfast and for lunch, both of which I refused*.

Defs.' 7.1 Statement, Ex. J, Grievance, dated Jan. 28, 2002 (emphasis added).

Thus, by Plaintiff's own admission, he was offered both breakfast and lunch on January 28, 2002.

Therefore, it is recommended that Plaintiff's remaining meal-deprivation claims be **dismissed.**

### 5.  *Tightness of Shackles and Cuffs*

Plaintiff alleges that on August 17, 23, 27, 28, and September 3, 2002, Defendant Considine

"willfully and wantonly" placed handcuffs and shackles on his ankles and wrists too tightly, causing

him "great pain and permanent nerve damage."  Am. Compl. at ¶¶ 58-61.  Plaintiff also alleges that

on September 7, 2002, Defendant Clarke placed shackles on him too tightly, also causing him pain and nerve damage.  *Id.* at ¶ 82.  Defendants assert that the above allegations are conclusory and insufficient to state a valid claim under the Eighth Amendment as a matter of law.  Defs.' Mem. of Law at pp. 30-33.  We agree.

Although a cause of action may lie under the Eighth Amendment for injuries caused by the wanton use of extremely tight handcuffs and/or shackles, *see, e.g., Davidson v. Flynn*, 32 F.3d 27 (2d Cir. 1994), in this case, Plaintiff does not state enough facts to state a valid claim.  Plaintiff does not allege for how long the handcuffs and shackles were applied, nor the circumstances of their application.  He simply alleges that they were applied "wantonly" and caused severe pain and nerve damage, without any explanation as to how the nerve damage was caused or how he learned of such injury.  *See Jemzura v. Public Service Com'n,* 961 F. Supp. 406, 413 (N.D.N.Y. 1997) (citing *Zemsky v. City of New York*, 821 F.2d 148, 151 (2d Cir. 1987) for the proposition that "[e]ven a *pro se* Complaint must be dismissed if it contains only conclusory, vague or general allegations") (internal quotations omitted).

Therefore, it is recommended that these conclusory allegations be **dismissed** as a matter of law and pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), which gives the Court the power to dismiss *at any time* a complaint brought by a prisoner proceeding *in forma pauperis* for failure to state a claim.

### D.  Retaliation

Plaintiff alleges that the Deprivation, Restraint, and Cell Shield Orders discussed above were issued against him in retaliation for lawsuits he filed in 1989.  The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since

"virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) & *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky*, 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995)).

### 1. *Deprivation Orders*

Plaintiff asserts that the November 2001 and July 2002 Deprivation Orders were issued in

retaliation for lawsuits he filed against Burns and other Auburn employees in 1989.  Am. Compl. at ¶¶ 8-11. The filing of lawsuits is conduct protected by the First Amendment, however, Plaintiff has failed to show a causal connection between the lawsuits he filed in 1989 and the issuance of the Depravation Orders.  As discussed above, Plaintiff has offered no evidence to rebut Defendants proof that the Deprivation Orders were precipitated by Plaintiff's own actions and history of misbehavior.  Furthermore, there is no evidence that the Deprivation Orders issued in 2001 were motivated by lawsuits he filed in 1989.  Indeed, such a significant temporal gap undermines any allegation of a causal connection.  Therefore, it is recommended that these retaliation claims be **dismissed**.

### 2. *Restraint and Cell Shield Orders*

Plaintiff asserts that Defendant Burns issued retaliatory Restraint and Cell Shield Orders against him on November 14, 2001, which were renewed through June 25, 2002, by Burns, Gummerson, Rourke, and Bradt.  Am. Compl. at ¶¶ 8-11.  Restraint orders "designate what restraints need to be placed on inmates when they are out of their cells, including hand cuffs and leg irons." Bradt Aff. at ¶ 20.  A cell shield is "a transparent cell front covering, equipped to provide adequate ventilation," which are ordered to, *inter alia*, protect against "[s]pitting through the cell door, or the throwing of feces, urine, food, or other objects through the cell door."  N.Y. COMP. CODES R. & REGS. tit. 7, § 305.6(a)-(b).

Bradt asserts that Plaintiff was issued Restraint and Cell Shield Orders upon his arrival at Auburn on November 14, 2001, due to "Benitez's extensive record of threats, violence, and unhygienic acts toward staff" and history of disruptive behavior.  Bradt Aff. at ¶¶ 14, 18, 21 & Exs. D-E, Shield and Restraint Orders, dated Nov. 14, 2001 through Sept. 10, 2002.  Those Orders were

subsequently renewed by Defendants Burns, Rourke, Gummerson, and Bradt on a weekly basis due to Plaintiff's disciplinary history. *Id.* at ¶¶ 15 & 22.

Thus, Defendants have provided evidence that the Shield Orders were imposed for valid penological reasons. Beyond his allegations, Plaintiff offers no proof that the Shield and Restraint Orders were issued for any improper reason. Also, as mentioned above, the fact that he sued several Defendants in 1989 is not sufficient to demonstrate a causal connection to the Shield and Restraint Orders issued in 2001 and 2002. Therefore, it is recommended that these retaliation claims be **dismissed**.

### E.  Due Process Claims

Plaintiff alleges that his due process rights were violated during the course of three separate Disciplinary Hearings conducted in November 2001 and July 2002. Am. Compl. at ¶¶ 2-7 & 41-50. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.* However, because Defendants do not challenge Plaintiff's assertion of a liberty interest, we move directly to the question of whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).

A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four (24) hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action taken. *Id.* at 564-66; *see*

*also Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986); *Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983)).

### 1. *November 2001 Disciplinary Hearing*

Plaintiff alleges Defendant Locastro violated his due process rights at a Disciplinary Hearing that commenced on November 21, 2001. Am. Compl. at ¶¶ 1-6. Specifically, Plaintiff alleges that (1) he was denied the right to present a video as documentary evidence; and (2) Locastro improperly took confidential testimony from Wayne Crozier and, without offering any justification, refused to disclose the substance of such testimony. *Id.*

Plaintiff was transferred from Clinton Correctional Facility to Auburn on November 14, 2001. Am. Compl. at ¶ 8. On November 8, 2001, while still incarcerated at Clinton, Plaintiff was issued a Misbehavior Report accusing him of squirting a brown liquid that smelled like feces from a toothpaste tube on C.O. R. Duprey,[14] and charging him with the following violations: assault, threats, disruptive behavior, harassment, and committing an unhygienic act. Defs.' 7.1 Statement, Ex. B, Misbehavior Rep., dated Nov. 8, 2001.

During the Disciplinary Hearing, which was held at Auburn after Plaintiff's transfer, Plaintiff requested a copy of a security videotape from Clinton that would show the incident and allegedly prove his innocence. *Id.*, Ex. S, Disciplinary Hr'g Tr., dated Mar. 21, 2002, at p. 10. Defendant Locastro, who presided over the Hearing, adjourned the proceeding so Plaintiff could make his evidentiary requests through an assistant. *Id.* at pp. 11-12. When the Hearing resumed, Locastro read into the record a memo from Defendant Lt. Miller indicating that "there is no videotape of the incident available" because the "system which would normally record all the areas of our Special

---

[14] R. Duprey is not a Defendant in this action.

*-23-*

Housing Unit was not operating on 11/08/01." *Id.* at p. 13.  Locastro noted that he couldn't "produce something that's unavailable." *Id.* at p. 14.

Later in the Hearing, Plaintiff asserted that in another recent Disciplinary Hearing held at Auburn concerning charges against him that also stemmed from events occurring at the SHU in Clinton on November 8, 2001, he was provided a videotape of that incident and was able to prove his innocence therewith. *Id.* at pp. 30-33.  Notwithstanding that argument and Plaintiff's production of proof of the favorable disposition he received in that Hearing, Locastro still found Plaintiff guilty of creating a disturbance, assault on staff, committing an unhygienic act, and harassment; Locastro found Plaintiff not guilty of making threats. *Id.* at p. 34.  In rendering his decision, Locastro relied on the testimony of C.O. Duprey and the confidential testimony of Mr. Wayne Crozier. *Id.*

Plaintiff alleges that Locastro's failure to produce a videotape of the November 8, 2001 incident at Clinton violated his due process rights.  The record shows that Locastro attempted to obtain the video, but was informed of its unavailability in a memo from Defendant Miller.  Locastro did not violate Plaintiff's due process rights when he relied upon Miller's statement that the videotape was unavailable. *See, e.g., Hodges v. Jones*, 873 F. Supp. 737, 744 (N.D.N.Y. 1995) ("Due Process does not require that the hearing officer's credibility assessments or weighing of the evidence be evaluated; rather, the relevant standard is whether there is some evidence in the record to support the disciplinary decision.") (citing *Superintendent, Massachusetts Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985)).  After reviewing the Hearing Transcript, it is clear that Locastro's disposition was based on "some evidence," which included Officer Duprey's testimony that Plaintiff squirted liquid fecal matter at him using a toothpaste tube. Defs.' 7.1 Statement, Ex. S, Disciplinary Hr'g Tr. at pp. 26-27.  Finally, Plaintiff was provided notice of the charges against him, an opportunity to

present other evidence and to question witnesses, and Locastro's disposition statement that included

the evidence relied upon. *Id.* at pp. 1-35.

Plaintiff also alleges that Locastro violated his due process rights when he took confidential

testimony from Wayne Crozier. With respect to that testimony, Defendant Locastro has submitted

an Affidavit asserting that

> [a]fter reviewing the record and hearing from plaintiff, I decided to conduct a confidential interview, via telephone, of the Mental Health Staff at Clinton CF. I did so to determine if there were any medical or legitimate psychiatric reasons that would mitigate any penalty I might impose on Plaintiff. I excluded plaintiff from the interview as standard DOCS procedure at the time, to protect the mental health care staff from any possible retaliation and to insure their candor in relating whether or not an inmate's behavior could be excused or explained as resulting from mental illness.
>
> I did not seek any evidence related directly to the charges in conducting the confidential interview. I only sought to determine if there were mental health concerns that might have been relevant to plaintiff's behavior.

Dkt. No. 132, Joseph Locastro Aff., dated June 1, 2009, at ¶¶ 3-4.[15]

Defendants note that pursuant to DOCS regulations, "[w]hen an inmate's mental state or intellectual

capacity is at issue," the hearing officer "shall consider evidence regarding the inmate's mental

condition or intellectual capacity." N.Y. COMP. CODES R. & REGS., tit. 7, § 254.6(b). Plaintiff has

not offered any response to Locastro's averments. There is no evidence to suggest that Plaintiff's

due process rights were in any way violated when Locastro interviewed Crozier to ascertain if there

existed any mitigating circumstances occasioned by Plaintiff's mental health.

---

[15] In their Motion for Summary Judgment, Defendants submitted separately to Chambers for an *in camera* review a portion of the November 2001 Disciplinary Hearing Transcript that contained the confidential testimony of Wayne Crozier, which was identified as Exhibit T. Dkt. No. 118. Thereafter, the Court returned Exhibit T to Defendants' counsel and ordered that it would only approve an *in camera* review upon the submission of a formal request from Defendants. Dkt. No. 119. Thereafter, Defendants filed a Formal Application for permission to submit Exhibit T for an *in camera* review, which was denied. Dkt. Nos. 120 & 129. Subsequently, Defendants submitted Locastro's Affidavit in lieu of submitting Exhibit T. Dkt. No. 132.

Therefore, it is recommended that these due process claims be **dismissed**.

### 2. *July 11, 2002 Disciplinary Hearing*

On July 11, 2002, Defendant Gummerson presided over a Disciplinary Hearing concerning three separate Misbehavior Reports all issued on July 9, 2002.  Plaintiff alleges that on July 11, 2002, Defendants C. Clarke and S. Crozier "willfully and knowingly falsely told Gummerson that Benitez had refused to attend [the hearing]."  Am. Compl. at ¶ 41.  Benitez asserts that Gummerson

> wilfully and wantonly commenced the hearing . . . without making an attempt to interview [him] personally in order to ascertain (a) whether Benitez had been provided a copy of the misconduct reports . . .; (b) whether Benitez had made a knowing, voluntary, and intelligent waiver of his right to attend the hearing; and (c) whether Benitez had been advised of the consequences of his failure to attend the hearing.

*Id.* at ¶ 42.

Furthermore, Plaintiff asserts that after he was found guilty of charges, Clarke and Crozier refused to provide him with a copy of the hearing disposition sheet.  *Id.* at ¶ 44.

Defendants have provided a copy of a Waiver Form, dated July 11, 2002, signed by Defendant Crozier, which indicates that Plaintiff refused to attend the Hearing and also refused to sign the waiver form acknowledging such refusal.  Defs.' 7.1 Statement, Ex. D, Waiver Form, dated July 11, 2002.  Defendants have also submitted a copy of an Inter-Departmental Communication from Clarke to Gummerson, in which Clarke states that on July 11, 2002, he delivered a copy of the disposition rendered in the July 11th Tier III Disciplinary Hearing as well as an appeal form to Benitez.  *Id.*, Inter-Dep't Comm., dated July 11, 2002.  Finally, a case data worksheet reflects that Plaintiff was provided copies of the three Misbehavior Reports on July 10, 2002.  *Id.*, Case Data Worksheet, dated July 10, 2002.

Beyond his own accusations, Plaintiff has offered nothing to rebut the Defendants'

documentary case. *See* Pl.'s Mem. of Law at pp. 16-19.  Although Plaintiff alleges that Gummerson

knew that he did not have copies of the July 9th Misbehavior Reports because he was under

Deprivation Orders and "that Clarke and Crozier had falsely notified him [on July 11, 2002] that

Benitez had refused to attend the hearing," Pl.'s Mem. of Law at p. 17, there is nothing in the record

to substantiate those claims.  *See Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory

allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when

the moving party has set out a documentary case.").  Furthermore, Plaintiff has offered no legal

support for his conclusion that a hearing officer is required to personally interview an inmate in

order to assure the voluntariness of his waiver of appearance, nor has the Court's research revealed

any precedents supporting such conclusion.  Therefore, because Plaintiff received a copy of the

Misbehavior Report, waived his right to attend the Disciplinary Hearing, and was provided a copy

of its disposition, it is recommended that these claims be **dismissed**.  *See Dawes v. Carpenter,* 899

F. Supp. 892, 897 (N.D.N.Y. 1995) (citing *Boddie v. Connecticut*, 401 U.S. 371 (1971) for the

proposition that "[d]ue process requires only that an accused have an opportunity to be heard, an

opportunity that can be waived").

### 3.  *July 16, 2002 Disciplinary Hearing*

Plaintiff makes similar allegations concerning his July 16, 2002 Disciplinary Hearing: (1)

John Doe No. 7 denied him a copy of the Misbehavior Report; (2)  Clarke and Considine "falsely

told Defendant Wolcyzk [] that Benitez had refused to attend" the Disciplinary Hearing; (3)

Wolcyzk "wantonly commenced the hearing without making an attempt to interview Benitez

personally" in order to determine if his waiver was voluntarily and intelligently made; and (4)

Clarke and Crozier "refused to provide [him] a copy of the hearing disposition sheet."  Am. Comp.

at ¶¶ 45-47 & 49.

The July 16, 2002 Disciplinary Hearing concerned a Misbehavior Report issued against Plaintiff on July 10, 2002. Defs.' 7.1 Statement, Ex. E, Misbehavior Rep., dated July 10, 2002. Once again, Defendants have submitted documentary evidence that Plaintiff waived his right to be present at the Disciplinary Hearing and was provided a copy of the disposition. A "Refusal to Attend Hearing" Form, dated July 16, 2002, reflects that Plaintiff refused to attend the July 16 Tier III Hearing and also refused to sign the refusal form. *Id.*, Refusal to Attend Hr'g Form, dated July 16, 2002. Also in the record is an Inter-Departmental Communication from Clarke to Wolcyzk indicating that he delivered Plaintiff a copy of Wolcyzk's disposition on July 17, 2002, as well as an appeal form. *Id.*, Inter-Dep't Comm., dated July 16, 2002. Finally, a Case Data Worksheet shows that Plaintiff was given a copy of the July 10 Misbehavior Report. *Id.*, Case Data Worksheet, dated July 11, 2002.

Contrariwise, Plaintiff has offered no evidence in support of his allegations. Therefore, because Plaintiff has failed to show a material question of fact exists with respect to these due process claims, it is recommended that they be **dismissed**.

## F.  Failure to Serve

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m).[16] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that

---

[16] Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

defendant.  *Id.*

In this case, there is no indication that the Defendants John Does Nos. 1-7, and C.O. Smith[17] were properly served.  Because Plaintiff's claims against John Doe No. 7 and C.O. Smith lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against John Doe No. 7 and C.O. Smith be **dismissed**.  As previously discussed, we have recommended that Plaintiff's claims against John Does Nos. 1-6 not be dismissed.  Should the District Court adopt that recommendation, we will afford Plaintiff the opportunity to file a motion to amend his Amended Complaint in order to name John Does Nos. 1-6.  If such motion is submitted and granted, we would at that time direct the effectuation of service on John Does Nos. 1-6.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Defendants' Motion for Summary Judgment (Dkt. No. 118) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED**, that should the District Court adopt this Report-Recommendation, the only remaining Defendants will be Rourke and John Does Nos. 1-6; and it is further

**ORDERED**, that should the District Court adopt this Report-Recommendation, Plaintiff shall be afforded **thirty (30) days** from the date of such adoption to file a motion to amend his Amended Complaint in order to identify John Does Nos. 1-6, which shall include a proposed Second Amended Complaint attached thereto; and it is further

---

[17] C.O. Smith is named "R. Smith" on the Docket, but we have referred to him as "C.O. Smith" in order distinguish him from Defendant Nurse R. Smith.  *See* Dkt. No. 106 at p. 4 n.3.  Nurse R. Smith has been served with process, Defendant C.O. Smith has not.  Dkt. Nos. 13 & 37.

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).

Date:   September 30, 2009
         Albany, NY

RANDOLPH F. TREECE
United States Magistrate Judge

*-30-*